**POWER AUTHORITY OF the STATE OF NEW YORK, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 75, Docket 28806.

United States Court of Appeals Second Circuit.

Argued Oct. 15, 1964.

Decided Dec. 8, 1964.

Rehearing and Rehearing in Banc Denied Jan. 11, 1965.

Thomas F. Moore, Jr., New York City, (Edward L. Ryan, Scott B. Lilly, Lewis R. Bennett, New York City, of counsel), for petitioner.

Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., Joseph Hobbs, Donald Sander, Attys., F. P. C., Paul A. Sweeney, Special Consultant, for respondent.

Before WATERMAN, MOORE and SMITH, Circuit Judges.

WATERMAN, Circuit Judge.

On July 15, 1953, the Power Authority of the State of New York was issued a license by the Federal Power Commission to construct certain power and navigation works on the St. Lawrence River. Article 27 of the license provided for the payment of annual charges by the Power Authority to the Commission in accordance with Section 10(e) of the Federal Power Act, 16 U.S.C. § 803(e).[1] The works having been constructed, the Power Authority was billed for the charges beginning July 17, 1958.

The Power Authority thereupon applied for total exemption from the charges under the proviso to Section 10(e):

"[L]icenses for the development, transmission, or distribution of power by States or municipalities shall be issued and enjoyed without charge to the extent such power is sold to the public without profit or is used by such State or municipality for State or municipal purposes, except that as to projects constructed or to be constructed by States or municipalities primarily designed to provide or improve navigation, licenses therefor shall be issued without charge; * * *."

The Power Authority claimed that the project in which it was engaged was primarily designed to improve navigation, and it also claimed that the power it produced was either used by it for state or municipal purposes or was sold ultimately to the public without profit. The Commission denied the application in large part, but subsequently granted a

1. "All licenses issued under sections 791a-823 of this title shall be on the following conditions:

   *     *     *     *     *

"(e) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for the purpose of reimbursing the United States for the costs of the administration of sections 791a-823 of this title; * * *."

rehearing. The new proceedings, expanded by stipulation to cover charges imposed through December 31, 1961, commenced in 1962. Following an extensive hearing, the examiner rendered an initial decision in 1963, in essence upholding the prior determination.

On January 13, 1964, the Commission issued a final order, affirming the hearing examiner's decision. 51 PUR3d 417. The Commission conceded that the Power Authority is a municipality within the meaning of Section 10(e) of the Federal Power Act. It ruled, however, that the project in which the Power Authority is engaged was not primarily designed to provide or improve navigation, and that the power sold by the Power Authority ultimately for public use was not sold without profit.[2] The Power Authority, pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b), petitions for review of these rulings.

Was the project designed primarily to provide or improve navigation?

The history of the St. Lawrence development program furnishes a useful introduction to this question. In 1909 the United States and Great Britain entered into a treaty providing for the use and development of boundary waters between the United States and Canada and creating an International Joint Commission to pass on any projects which would affect the flow or level of the boundary waters. Although numerous proposals to carry out the purposes of the treaty were offered during the next thirty years, no action was taken on them, apparently because of objections to their navigational aspects.

In 1940, a comprehensive report on the development of the St. Lawrence River was filed by a committee composed of engineers from the United States and Canada. The report divided the work to be done into three categories: works solely for navigation, works primarily for power, and works common to navigation and power. An executive agreement between the United States and Canada, providing for implementation of the report, was signed the following year, but it failed of approval by the United States Congress, as was required in the agreement.

Finally, in 1951, the President of the United States and the Prime Minister of Canada reached an understanding designed to break the stalemate. The works designated in the 1940 report as primarily for power and common to power and navigation were to be built by the United States and Canada under the 1909 treaty. The works designated as solely for navigation were to be built by Canada alone, unless the 1941 executive agreement was concurred in by Congress, in which case they would be built jointly by the two countries.

In 1952 the portion of the program to be built under the 1909 treaty was submitted to the International Joint Commission and was approved by that body. The Canadian government had already chosen the Hydro-Electric Power Commission of Ontario to do Canada's share of the work. The following year the Power Authority of the State of New York was selected by the President of the United States to construct the works on the American side of the St. Lawrence. At the same time, the Power Authority applied to the Federal Power Commission and was granted a license in accordance with the plans approved by the International Joint Commission.

In 1954 the United States Congress finally enacted legislation authorizing American participation in construction of the portion of the program designated as solely for navigation. The St. Lawrence Seaway Development Corporation was created to do this country's share of the work. The St. Lawrence Seaway Authority of Canada had already been

---

**2.** The Commission also determined that the entities to whom the Power Authority sold power for resale to the public resold the power at a profit. We find it unnecessary to reach this alternative ground for denying the exemption to the Power Authority.

chosen to make the improvements on the Canadian side of the St. Lawrence. Work began immediately on all phases of the program and by 1959 the entire development was virtually complete and in operation.

Our first task is to define the boundaries of the "project" whose primary purpose is at issue.[3] The Federal Power Commission ruled that the project consists only of the works licensed to the Power Authority in 1953 and the land on which they are located. The Power Authority contends that it encompasses the complete St. Lawrence development program. In resolving this disagreement, the decision of the United States Court of Appeals for the District of Columbia in Lake Ontario Land Development Ass'n v. FPC, 93 U.S. App. D.C. 351, 212 F.2d 227 (1954), cert.denied, 347 U.S. 1015, 74 S.Ct. 871, 98 L.Ed. 1138 (1954), is most illuminating.

That case involved a challenge to the legality of the license issued to the Power Authority by the Federal Power Commission. One branch of the challenge was based on Section 14 of the Federal Power Act, 16 U.S.C. § 807. The section provides that " * * * the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project * * * covered in whole or in part by the license * * *." Petitioners there argued that because the United States could not take over the part of the project located in Canada, a license could not be issued for the part of the project located in this country.

The court apparently assumed, at that point and throughout its opinion, that the "project" consisted of the works to be constructed jointly by the Power Authority and Ontario Hydro. It accommodated the language of the statute to this concept of the project by construing Section 14 to mean that "the United States shall have the right to take over the whole of the project so far as it has jurisdiction to take it over." Id. at 234. Thus the court initially drew the boundaries of the project broadly, and then, in effect, narrowed them to conform to the wording of the statute and to the practical necessities of an international undertaking.

■ We are inclined, for the sake of judicial interpretative consistency, to adhere to the broader definition of the project adopted by the District of Columbia Circuit in the first instance. However, as a practical matter, it makes no difference whose view—the court's, the Power Authority's, or the Commission's—we accept as our starting point, for, as in the Lake Ontario case, the language of the Federal Power Act requires us ultimately to resort to the narrow concept of the project as being the works licensed to the Power Authority and the land on which those works are located.

■ The portion of Section 10(e) with which we are now concerned relates to "licenses * * * issued" for "projects constructed * * * by States or municipalities." 16 U.S.C. § 803(e).[4]

---

3. According to 16 U.S.C. § 796(11):
   " '[P]roject' means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, the primary line or lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit;"

4. We are aware of the fact, insisted upon by the Power Authority, that the Federal Power Commission, strictly speaking, licenses "project works," not "projects." 16 U.S.C. § 797(e); Lake Ontario Land Development Ass'n v. FPC, supra, 212 F.2d at 232. The wording of Section 10(e) is thus inaccurate. We have chosen to remedy the inconsistency by

The only part of the project in connection with which a license was issued by the Federal Power Commission was the part licensed to the Power Authority. Likewise, the only segment of the project constructed by a state or municipality was the segment constructed by the Power Authority. Accordingly, if Section 10(e) applies here, it applies to the "project" *so far as* a license in connection therewith was issued to the Power Authority. Compare the interpretation of Section 14 by the District of Columbia Circuit, supra.

■ The sole alternative to this reading of Section 10(e) is that it applies only to projects *wholly* licensed to states or municipalities by the Federal Power Commission. If the statute means this, no state or municipality, jointly engaged in improving navigation with an entity of a different kind, could ever be exempted from paying license charges. As was the District of Columbia Circuit, we are reluctant to inhibit joint undertakings in this way. The Commission is not in direct disagreement with this conclusion. Cf. 51 PUR3d at 420.

■ Our next task is to determine whether the project, as defined above, was "primarily designed to provide or improve navigation." The Commission found as a fact that it was not so designed. The only precedent on point, South Carolina Public Service Authority v. FPC, 200 F.2d 78 (4 Cir.1952), is of little help to us in reviewing this finding. Congress, however, in Section 313(b) of the Federal Power Act, has laid down the general rule that factual determinations by the Commission are conclusive "if supported by substantial evidence." 16 U.S.C. § 825*l*(b).

The finding of the Commission in this case was so supported. The Power Authority worked only on those portions of the overall St. Lawrence River program that were designated in the 1940 report as being primarily for power, or common

to power and navigation, and never on those portions which were designated as solely for navigation. Furthermore, the authorizations granted to the Power Authority by the International Joint Commission, the President of the United States, and the Federal Power Commission refer almost exclusively to the production of hydro-electric power. Even the Power Authority concedes that one-fifth of its construction costs were for works that only benefited power production.

The Power Authority claims that the authorizations it was granted nevertheless gave primacy to navigational improvements. It points to the fact that the 1909 treaty on the development of boundary waters expressly preferred uses for navigation to uses for power, and that both the International Joint Commission and the Federal Power Commission recognized this preference as binding upon them when they issued their approval orders and provided for the implementation of those orders. But those expressions of navigational preference need only mean that in case of conflict power production must give way to unimpeded navigation. They no more prove that the primary purpose of the project was to facilitate navigation than a provision for a draw on a bridge over the St. Lawrence would prove that the primary purpose of the bridge was to aid navigation.

The Power Authority also contends that most of the major features of the project aid navigation as well as aid in the production of power; that they would have been designed differently, and less expensively, were it not for the aim of promoting navigation; and that these features have at times been operated contrary to the interest of power production in order to advantage navigation. Assuming that all these contentions are true, again they need prove no more than that ease of shipping is an important secondary value of the project and at times

reading "therefor" as if it meant "in connection therewith." The only plausible alternative would be to construe "proj-

ects" to mean "project works," in which case the Power Authority's view would be even more plainly unacceptable.

should be given the right of way. The Commission was not required to regard these contentions as conclusive of the fact that the project was designed primarily for navigation.

Was the power sold ultimately for public use by the Power Authority sold without profit?

■ According to the law by which it was created, the terms under which its bonds were issued, and the contracts with its customers, the Power Authority must charge rates sufficient to cover its operating costs and to retire its capital debt within fifty years, but it may not charge rates in excess thereof. We may assume that the Power Authority has adhered in practice to these restrictions.[5] Nevertheless, the Commission ruled that the revenue collected by the Power Authority to retire its capital debt constituted "profit," and in reaching this result relied on the interpretation of Section 10(e) embodied in its Regulation 11.24(d), 18 C.F.R. § 11.24(d).[6] The Power Authority assails the regulation as invalid.

Congress has authorized the Commission, by Section 309 of the Federal Power Act, to prescribe such regulations "as it may find necessary or appropriate to carry out the provisions of this chapter," including definitions of "accounting, technical, and trade terms" used in the act. 18 U.S.C. § 825h. The District of Columbia Circuit has construed the parallel portion of the Natural Gas Act as giving the Commission considerable discretion to choose the means by which the purposes of the act may be achieved. Public Service Comm. of State of New York v. FPC, 117 U.S.App.D.C. 195, 327 F.2d 893, 896–897(1964).

In its only previous challenge in the courts, Regulation 11.24(d) was upheld by the United States Court of Appeals for the Eighth Circuit. Central Nebraska Public Power Dist. v. FPC, 160 F.2d 782 (1947), cert. denied, 332 U.S. 765, 68 S.Ct. 72, 92 L.Ed. 351 (1947). There the Power District was authorized by law to make ordinary business profits so as to provide for expansion, and it attempted to include depreciation as well as debt retirement in its operating costs. Hence the case may be distinguishable on its facts from the case before us, but the reasoning of the decision is fully applicable.

Noting that the Commission had, for twenty-five years, consistently interpreted "profit" in the accounting sense, as an excess of revenues over operating costs, the Eighth Circuit held that "this court may not upset the long settled administration of the Federal Power Act in this vitally important phase without clearly compelling reasons." Id. at 786. This holding was in accord with an established rule of statutory construction which was later applied to the Federal Power Act by the Supreme Court. United States v. Public Utilities Comm., 345 U.S. 295, 314–315, 73 S.Ct. 706, 97 L.Ed. 1020 (1953). The passage of another seventeen years of consistent interpretation by the Commission confirms the relevance of the rule to this case.

---

5. The Commission determined that the rates set by the Power Authority also provide for reserves for contingencies, reserves for new construction, and accumulation of funds for working capital. However, the Commission has not pressed these determinations on appeal, and we find it unnecessary to take them into account.

6. "No State or municipal licensee shall be entitled to exemption from the payment of annual charges on the ground that power generated, transmitted, or distributed by the project is sold to the public without profit, unless such licensee shall show:

\* \* \* \* \*

"(2) That an income statement, prepared in accordance with the Commission's Uniform System of Accounts, shows that the revenues from the sale of project power do not exceed the total amount of operating expenses, maintenance, depreciation, amortization, taxes, and interest on indebtedness, applicable to the project property. Periodic accruals or payments for redemption of the principal of bonds or other indebtedness may not be deducted in determining the net profit of the project."

Apart from a futile quibble with the wording of the regulation, the Power Authority argues that "profit", as used in Section 10(e), signifies "business profit" rather than "accounting profit." It relies on the more commonly understood meaning of the word, and, in doing so, overlooks the fact that the Federal Power Act was written for technicians, not for laymen. It also points to various congressional enactments,[7] and to a recent decision of this court,[8] that treat entities which, like the Power Authority, set power rates high enough to enable them to retire indebtedness, as entities which operate on a "non-profit" or "cost" basis.

However, not one of these pronouncements is even remotely concerned with the problem of who should be required to help the Federal Power Commission defray the Commission's administrative expenses. Consequently, we find no merit in these contentions of the Power Authority. We have in mind the trenchant warning of Walter Wheeler Cook:

"The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against." "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L.J. 333, 337 (1933).

The nub of the Power Authority's attack on Regulation 11.24(d) is that the regulation allows an exemption only to those public power producers who operate at a loss. To this objection we repeat the response given in Central Nebraska Public Power Dist. v. FPC, supra, 160 F.2d at 786:

"[T]he yardstick of profit or loss from sales of power prescribed by Congress to measure liability for or exemption from annual charges may

7. 16 U.S.C. §§ 825s, 831i, 832b, 832f, 833b, 833e, 836(b) (1).

8. Merritt-Chapman & Scott Corp. v. Public Utility Dist. No. 2, 319 F.2d 94, 107

not be in all aspects and incidents the best means of advancing the broad object of the Act to aid in the development of power from natural resources. * * * But we think that in substance the arguments for the allowance of the exemption to this District, which does receive an excess of income from sales to the public, go to the policy of the statute which is not for the courts."

Order affirmed.

(1963), cert. denied, 375 U.S. 968, 84 S.Ct. 488, 11 L.Ed.2d 417 (1964).