ALASKA ENERGY
AUTHORITY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 90–1366.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 1991.
Decided March 29, 1991.

Carol Hewitt, for petitioner. Julie Simon, Rick T. Haselton, Douglas B. Bailey, Carolyn E. Jones, and Charles E. Cole, were on the brief, for petitioner.

Katherine Waldbauer, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, and Joseph S. Davies, Deputy Sol., F.E.R.C., were on the brief, for respondent.

Before SILBERMAN, D. H.
GINSBURG, and HENDERSON, Circuit
Judges.

Opinion for the Court filed by Circuit
Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case concerns the meaning of the statutory phrase "without profit" in section 10(e) of the Federal Power Act, which provides an exemption from the payment of annual license fees by publicly-owned utilities "to the extent such power is sold to the public without profit." 16 U.S.C. § 803(e). The Alaska Energy Authority (AEA) challenges FERC's implementing regulations as contrary to congressional intent, and alternatively argues that AEA is entitled to an exemption even under the regulation's narrow definition of "without profit." We hold that FERC has reasonably interpreted an imprecise statutory phrase in its regulation, and petitioner fails to show that the Commission's application of the regulation is arbitrary and capricious.

I.

AEA is a state-owned public corporation which administers the Four Dam Pool Project, designed to generate low-cost electricity for transmission to remote communities in southeastern and southcentral Alaska. AEA sells the output of the Four Dam Pool to three municipalities and two rural cooperatives (collectively, "Purchasers") who resell the power to their retail customers. AEA is the Purchasers' sole source of power with the exception of incidental backup.

AEA applied to FERC for an exemption from payment of annual license fees on the Four Dam Pool project under the not-for-profit exception.[1] The Controller denied AEA's application and AEA appealed to the Commission, which affirmed the Controller.

■ The regulations, set out in the margin, require that AEA make two showings—that it sells its power to its purchasers without profit, defined as the excess of revenues over expenses in a given year, and that its purchasers in turn sell the AEA power (project power or input) to the public without profit.[2] The Commission does not dispute that AEA made the first showing—that AEA sold its power to the Purchasers without profit. *Alaska Power Authority*, 49 F.E.R.C. ¶ 61,088 at 61,344 (1989). The point of contention between AEA and FERC involves the resale transaction between the Purchasers and their consumers. Applying its simple annual balance sheet test, FERC concluded that for the years in question all the Purchasers "had accumulated annual revenues in excess of their annual expenses and therefore had made a profit on their resales of AEA-

---

1. Section 10(e) of the Federal Power Act, 16 U.S.C. § 803(e) reads in pertinent part:

    **(e) Annual charges payable by licensees; exception**

    (1) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for the purpose of reimbursing the United States for the costs of the administration of this subchapter; for recompensing it for the use, occupancy, and enjoyment of its lands or other property; and for the expropriation to the Government of excessive profits until the respective States shall make provision for preventing excessive profits or for the expropriation thereof to themselves, ... *Provided further,* That licenses for the development, transmission, or distribution of power by States or municipalities shall be issued and enjoyed without charge to the extent such power is sold to the public without profit.

2. AEA was required to show, under 18 C.F.R. § 11.06(d)(2):

    That an income statement, prepared in accordance with the Commission's Uniform System of Accounts, shows that the revenues from the sale of project power do not exceed the total amount of operating expenses, maintenance, depreciation, amortization, taxes, and interest on indebtedness, applicable to the project property. Periodic accruals or payments for redemption of the principal of bonds or other indebtedness may not be deducted in determining the net profit of the project.

    In addition, AEA had to demonstrate, under 18 C.F.R. § 11.06(e), that the Purchasers resold the power to the ultimate consumer without profit:

    *Sales for resale.* ... [T]he licensee shall show that the power was sold to the ultimate consumer without profit. The matter of whether or not a profit was made is a question of fact to be established by the licensee.

provided power to the ultimate consumer." *Id.* at 61,343.

AEA advanced a number of arguments—all rejected by FERC—why the Purchasers' excess revenues did not bar AEA from claiming the exemption. Foremost was its contention that FERC's balance sheet definition of profit thwarted the intent of the statute to exempt public utilities from license fees so long as the utilities use all excess revenues for the benefit of their ratepayers. AEA also argued that FERC violated its own regulations by requiring that the Purchasers make a system-wide showing that revenues did not exceed expenses; since the Purchasers did not mark up project power for resale to their customers there was no profit on the resale of that specific AEA power. Any profits from other operations were therefore irrelevant to the existence of "profit" within the meaning of the statute. Finally, AEA claimed that FERC was unfairly holding AEA to the balance sheet test since, under the alternative rate-of-return approach used in *Sabine River Authority*, 10 F.E.R.C. ¶ 61,241 (1980), the Purchasers' pass-through of the cost of project power would meet the requisite showing of no profit.

FERC found nothing in AEA's argument to warrant abandonment of its interpretation of the statute, adhered to since 1938. The agency believed that the open-ended language of the statute left it the policy choice of how to define "profit." FERC dismissed AEA's other contentions because AEA had not offered adequate proof that the Purchasers did not mark up project power before resale.

## II.

■ As noted, AEA's principal challenge is that FERC's regulation defining profit is contrary to the statutory purpose. In petitioner's view, FERC's definition, which effectively restricts exemption to utilities operating at a loss, thwarts a broader congressional intent to grant an exemption from license fees to state and municipal utilities that use all revenues for the benefit of their ratepayers. AEA offers a more generous "closed system" definition under which the Purchasers would be thought to realize no profit so long as they retain all revenues within the utility system and use them exclusively to maintain and improve operations and service—to meet future capital expenses, to reduce long-term debt, or as operating reserves.

The statute, however, leaves the concept of "without profit" undefined. And since the sparse legislative history offers no clear guidance, we must defer to the agency's interpretation, if reasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). We simply have no grounds to conclude that FERC is unreasonable in interpreting "without profit" in the accounting sense of the excess of revenues over expenses. We agree with our sister circuits, who have rejected arguments akin to AEA's, that even if FERC's definition restricts the exemption to utilities operating in the red, nothing in the statute or the legislative history precludes that result. *See Power Auth. of the State of New York v. Federal Power Comm'n,* 339 F.2d 269, 275 (2d Cir.1964), *cert. denied,* 381 U.S. 933, 85 S.Ct. 1766, 14 L.Ed.2d 699 (1965); *Central Nebraska Public Power and Irrigation Dist. v. Federal Power Comm'n,* 160 F.2d 782, 786 (8th Cir.), *cert. denied,* 332 U.S. 765, 68 S.Ct. 72, 92 L.Ed. 351 (1947). As those courts noted, because the decision to define "without profit" in the no profit, balance sheet sense, rather than the "non-profit," "public benefit" sense is a policy choice, the decision is the agency's. *See Central Nebraska,* 160 F.2d at 785; *PASNY,* 339 F.2d at 275.

■ To be sure, we are left with some uncertainty as to the parameters of FERC's regulations. Unfortunately, at oral argument FERC counsel was unable to explain satisfactorily whether FERC looks at the excess of revenues over expenses on a system-wide basis or focuses solely on whether profit is earned on the particular input at issue. We need not remand for clarification, however, since, even under AEA's understanding of the agency's regulations—that AEA is obliged to show only

that the Purchasers did not make a profit on the specific power sold by AEA—AEA did not meet its burden. *See* 18 C.F.R. § 11.06(e). Petitioner insists that it demonstrated that there was no mark-up on the input purchased from AEA and resold to the ultimate consumer and that given this "undisputed" showing, FERC violated its own regulations by basing disqualification on the system-wide profit the Purchasers' income statements reflected. But all the Purchasers—municipalities and cooperatives alike—had substantial excess revenues and the power purchased from AEA and resold to the consumer appeared to be the principal source of that revenue, *see* 49 F.E.R.C. ¶ 61,088 at 61,343 n. 4.

The record evidence on which AEA relies as proof that the Purchasers do not mark up the cost of power to their consumers is its year-end recomputation of accounts—called a "true-up." AEA "trues-up" its accounts by calculating the actual cost of its power and adjusts its billing to the Purchasers who, in turn, pass-through any adjustment to their customers. AEA asserts that this demonstrates that the Purchasers sell power to the ultimate consumer without mark-up. As FERC points out, however, the "true-up" mechanism merely guarantees that no "unexpected" profits are earned by the Purchasers—it says nothing about the level at which the resale price is set originally. AEA made no effort to demonstrate that the Purchasers design their rates to ensure that there is no profit earned on AEA power. In fact, the record suggests the contrary—that the Purchasers' rates are set to recover a substantial portion of their revenue requirements from sales of project power. Petitioner's contention that the portion of the Purchasers' revenue requirements that is attributable to a build-up of a reserve for future debt service or capital expenditures is not properly thought of as profit is simply another way of phrasing its basic and ineffective challenge to FERC's definition of profit.

Alternatively, to demonstrate that no profit was made by the Purchasers on the resale of AEA power, AEA could show that all profits system-wide came from other sources. But AEA offered no record evidence to support its claim that the Purchasers' excess revenues were generated solely from mark-up on non-input items, such as demand charges. As FERC pointed out, both in its initial order, *see Alaska Power Authority*, 49 F.E.R.C. 61,088 at 61,345, 61,347, and on rehearing: "None of the filings from AEA shows that any excess revenues retained by the reselling utilities were earned only on the purchasers' transmission and distribution systems so that there was no profit on the resale of project power." *Alaska Energy Authority*, 51 F.E.R.C. ¶ 61,258 at 61,756.

The last argument petitioner brings to us is that FERC did not afford AEA and the Purchasers the same opportunity to show a lack of profit that it gave *Sabine River Authority* ten years ago. *See* 10 F.E.R.C. ¶ 61,241 (1980). In the only case in which FERC has permitted a licensing fee exemption for power producers not operating in the red, the agency was faced with a licensee whose power was commingled by the purchasing utility with other power before it was resold to the ultimate consumer. FERC, believing it was administratively infeasible to determine whether a profit was made on the resale of the licensee's power, nevertheless granted an exemption. Because *Sabine*, unlike petitioner, was a rate-regulated utility, the Commission thought that the power purchased from the licensee would be passed through to the consumer on a dollar-for-dollar basis as an expense, and that FERC could rely on the independent regulator to ensure that there was no mark-up.

Petitioner vigorously objects to FERC's distinction between regulated and non-regulated utilities, and we are not certain why *Sabine*'s regulated status was determinative in that case.[3] Nevertheless, FERC has

---

**3.** We cannot be sure whether FERC looked to the regulator to prevent circumvention of the no mark-up rule or whether FERC was relying on the regulator to ensure only a reasonable profit.

We doubt that FERC could draw a distinction under the statute between a regulated "profit" (the reasonable rate of return (r) times the rate base (RB)) and a non-regulated one, although

never applied *Sabine* in any other circumstance, and petitioner makes no contention that the Purchasers' difficulty in showing no mark-up on petitioner's power has anything to do with commingling other producers' power.

\*    \*    \*    \*    \*    \*

For the foregoing reasons the petition for review is denied.

*It is so ordered.*

FERC's counsel seemed to hold that view at oral argument. Nevertheless, we express no opinion as to whether *Sabine* should have any applicability in a non-commingling case.