CITY OF OSWEGO, NEW YORK, Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 95–1539.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1996.

Decided Oct. 18, 1996.

---

Carolyn Elefant, argued the cause, for petitioner, with whom Paul V. Nolan, Washington, DC, was on the briefs.

Eric L. Christensen, Attorney, Federal Energy Regulatory Commission, argued the cause, for respondent, with whom Jerome M. Feit, Solicitor, Washington, DC, and Joseph S. Davies, Deputy Solicitor, were on the

brief. Edward S. Geldermann, Attorney, Bethesda, MD, entered an appearance.

Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The City of Oswego, New York, petitions for review of three orders by the Federal Energy Regulatory Commission ("FERC") relating to the High Dam project, a hydroelectric power plant located on the Oswego River. In the orders, FERC issued the City a license to operate the project, but imposed retroactive annual fees for a period of unauthorized operation from 1949 to 1991 and denied the City's application for an exemption from the fees and for a waiver of any penalty for late payment.

The City challenges FERC's orders on three grounds. First, it contends that FERC lacked authority to require the City to pay retroactive annual fees for a period when the City did not operate the project, but merely leased the project facilities to Niagara Mohawk Power Company ("Niagara Mohawk") and its predecessors, which operated the project and sold the power. Second, the City contends that, even if the retroactive fees were properly imposed, it is entitled to a statutory exemption from licensing fees under the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a–828c, for municipalities that sell power to the public without profit. Third, the City contends that it was entitled to a waiver of any late-payment penalty because it demonstrated "good cause" for late payment when it advised FERC that the local governing body with authority to approve payment was not scheduled to meet until after the date when the payment was due.

We do not address the first of these contentions, because we conclude that the City's failure to seek rehearing of the order imposing the retroactive fees bars it from challenging that order now. As to the denial of the "without profit" exemption, we conclude that FERC's interpretation of the term "profits" to include the rental payments the City re-

ceived under the lease was a permissible interpretation of the statute. Finally, we conclude that FERC's response to the City's claim that the City Council's schedule would prevent timely payment was non-responsive, and therefore arbitrary. Accordingly, we deny the petition except with regard to the imposition of the late payment penalty; on that issue, we remand the case to FERC for further consideration.

## I.

Section 23(b) of the FPA, 16 U.S.C. § 817, makes it unlawful for any person, State, or municipality to "construct, operate, or maintain" a hydroelectric power project that is within FERC's jurisdiction without a valid license from FERC or a federal permit issued prior to 1920. A project falls within FERC's jurisdiction if it is located on a navigable water of the United States or public land or reservations of the United States, or if it uses surplus water from a government dam. *Id.* In addition, § 23(b) provides that any entity wishing to construct a new hydroelectric project along a non-navigable water of the United States over which Congress has Commerce Clause jurisdiction must file a declaration of intent with FERC. If FERC determines that interstate commerce would be affected by the proposed project, it falls within the agency's jurisdiction, and the entity may not construct, operate, or maintain the project without a license from FERC. This last category, however, applies only to projects constructed after the effective date of the FPA, August 26, 1935.

The High Dam project is located on the Oswego River in Oswego County, New York. The City of Oswego has owned the real property on which the project is situated at least since the 1920s, and leased it to Niagara Mohawk and its predecessors in interest from at least 1928 until 1993. Three hydroelectric generators were installed at the site in 1928, and a fourth was constructed in 1949. Neither the City nor Niagara Mohawk obtained a license for the project prior to 1981.

In 1981, Long Lake Energy Corporation, a competitor of Niagara Mohawk, applied to FERC for a license for the High Dam pro-

ject and several others. Thereafter, in 1982, the City and Niagara Mohawk filed a competing joint license application for the same projects. FERC instructed the City and Niagara Mohawk to file separate applications for each of the projects, although it did not prohibit them from filing a joint application for the High Dam project. The City then filed a separate application for a license for the High Dam project. Niagara Mohawk did not file an application. As a municipality, the City was entitled to a bidding preference under § 7(a) of the FPA, 16 U.S.C. § 800(a).[1]

In 1991, FERC found that the High Dam project fell within its jurisdiction. *City of Oswego*, 57 FERC ¶ 62,100 (1991). It noted that the Oswego River was found to be a navigable water in 1968, and that, in any case, a part of the High Dam project was constructed after 1935 and affected interstate commerce. *Id.* at 63,156. On November 22, 1991, FERC issued the Licensing Order, granting the City permission to operate and maintain the High Dam Project. *City of Oswego*, 57 FERC ¶ 62,139 (1991), *reh'g denied*, 67 FERC ¶ 61,150 (1994), *reconsideration denied*, 72 FERC ¶ 61,279 (1995). The Licensing Order contained two significant conditions. First, it required the City to modify its lease with Niagara Mohawk so that the City would have control over the project facilities.[2] *Id.* at 63,208–11. Second, the Licensing Order required the City to pay a fee equal to the total annual fees that would have been paid between 1949 and 1991, had the project been properly licensed in that period. *Id.* at 63,211. The Licensing Order stated that it "constitute[d] final agency action," and that requests for rehearing by FERC were to be filed within thirty days, pursuant to 18 C.F.R. § 385.713. *Id.* at 63,-220.

The City did not seek rehearing by FERC of the Licensing Order. On June 18, 1992, FERC sent the City a bill for the annual fees in the amount of $65,101.99, payable by August 2, 1992. On August 3, 1992, the City applied to FERC for an exemption from the annual charges for the period 1949 to 1991, pursuant to § 10(e) of the FPA, 16 U.S.C. § 803(e), and 18 C.F.R. § 11.6. Those sections provide, in relevant part, that a state or municipal licensee is exempt from annual charges to the extent that it sells the power generated by a project to the public without profit. The City also sought a waiver of any penalties for late payment of the fee, pursuant to the "good cause" provision in 18 C.F.R. § 11.21.

On September 16, 1992, FERC denied the request for a "without profit" exemption as to the charges for 1991, and denied a waiver of the late payment penalty. However, it granted the City an additional thirty days to submit information relating to its application for an exemption for the charges for prior years. Although the City apparently provided some additional information, its response is not part of the record before the court. FERC subsequently denied the request. The City paid $65,101.99 under protest on September 27, 1992, and FERC assessed a penalty for late payment. After unsuccessfully seeking rehearing and reconsideration of FERC's orders, *City of Oswego*, 67 FERC ¶ 61,150 (1994), *reconsideration denied*, 72 FERC ¶ 61,279 (1995), the City filed this petition.

## II.

■ The City contends that FERC lacked authority to impose the annual fees retroac-

---

1. Section 7(a) provides in relevant part:

   In issuing preliminary permits hereunder or original licenses where no preliminary permit has been issued, the Commission shall give preference to applications therefor by States and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted, to conserve and utilize in the public interest the water resources of the region. . . .

16 U.S.C. § 800(a). *See generally Oconto Falls v. FERC*, 41 F.3d 671, 672–74 (D.C.Cir.1994); *Clark–Cowlitz Joint Operating Agency v. FERC*, 775 F.2d 366, 376–79 (D.C.Cir.1985), *vacated on other grounds*, 826 F.2d 1074 (D.C.Cir.1987) (en banc), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988).

2. As a result, in 1993, the City entered into a new contract with Niagara Mohawk, under which Niagara Mohawk operated the project for the City and purchased the power generated at the project from the City.

tively from 1949 to 1991 because the City did not "construct, operate, or maintain" the project during that time period. *See* 16 U.S.C. § 817. It maintains that FERC's order went beyond the scope of this court's decision in *Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153 (D.C.Cir.1967), which allowed FERC's predecessor, the Federal Power Commission ("FPC"), to backdate licenses and impose fees from the issuance date. FERC responds that the City is barred from challenging the imposition of the fees because it failed to seek timely rehearing of the Licensing Order. In the alternative, FERC maintains that the retroactive assessment was proper under *Niagara Mohawk* and longstanding agency policy.

We agree with FERC that the City's failure to seek timely rehearing of the Licensing Order precludes it from attacking the validity of the retroactive fees here. Under § 313 of the FPA, 16 U.S.C. § 825*l*, any party seeking judicial review of a FERC decision must apply for an administrative rehearing within thirty days.[3] Furthermore, FERC's regulations provide that any decision designated as final is a "final decision" from which rehearing may be sought. 18 C.F.R. § 385.713(a)(2)(v) (1996). Here, the Licensing Order of November 21, 1991, provided that the license issued to the City would be backdated to 1981, and that the City would be required to pay an additional fee representing the annual charges that would have been imposed from 1949 to 1981, had a license been in effect during that time period. *City of Oswego,* 57 FERC at 63,211. The order also stated that it constituted a final agency action and that the City had thirty days to request a rehearing. *Id.* at 63,220.

The City chose not to seek a rehearing at that time, however. Instead, it waited until August 3, 1992, to file an application for an exemption from both the 1991 annual fee and the retroactive fees. Although the City did seek rehearing of FERC's order denying the exemption and waiver of any penalty for late payment, it never filed a timely objection with FERC to contest the initial Licensing Order decision of 1991 that the City was responsible for the retroactive fees. Consequently, the only issues properly before the court are whether the City was entitled to an exemption from payment of the annual fees, and whether the City demonstrated "good cause" entitling it to a waiver from any late-payment penalty.

■ The City's contentions to the contrary are unpersuasive. First, the City claims that the 1991 Licensing Order was not a final order because it did not specify the amount of the fee to be assessed or the procedure by which it was to be paid. This argument ignores this circuit's law that "[a]n order is reviewable when it 'impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship.'" *Conway Corp. v. FPC,* 510 F.2d 1264, 1267 (D.C.Cir.1975) (citing *Chicago & Southern Air Lines v. Waterman Steamship Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948)) (final three alterations in original), *aff'd,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). By this standard, the Licensing Order was final and therefore reviewable, because it imposed a definite obligation on the licensee to pay retroactive fees. *Cf. California Oregon Power Co. v. FPC,* 239 F.2d 426, 433 (D.C.Cir.1956) [hereinafter *COPCO*] (finding order unreviewable where Commission stated simply that it might impose license fees in the future). Moreover, the court has recognized that the amount of the fee constitutes a separate issue from the obligation to pay fees. Thus, in *Bluestone Energy Design v. FERC,* 74 F.3d 1288 (D.C.Cir.1996), the court held that the peti-

---

3. 16 U.S.C. § 825*l*(a) provides in relevant part: Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application, the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. . . .

tioner was barred from judicial review of an order finding it in violation of its license where it failed to seek rehearing, even though it was arguably entitled to review of a separate order assessing a penalty. *Id.* at 1293–94.

The City also notes that Niagara Mohawk did file a timely request for rehearing of the Licensing Order on December 23, 1991, which it subsequently withdrew. That fact is of no moment, however. First, it is unclear how that request, which is not included in the record, could have kept the City's issues alive. Furthermore, § 313 provides that any request for rehearing may be deemed to have been denied if the Commission takes no action within thirty days after it is filed. 42 U.S.C. § 825*l*(a); *see also Illinois Cities of Bethany v. FERC,* 670 F.2d 187, 193 & n. 15 (D.C.Cir.1981). Thus, even assuming that Niagara Mohawk's rehearing petition rendered the Licensing Order non-final, the City was entitled to deem it final as of January 22, 1992. Yet the City did not file its first petition for rehearing until October 16, 1992, nine months later. Finally, the plain language of § 313 requires that every party seeking judicial review of a FERC decision must first request a rehearing by FERC. *See* 16 U.S.C. § 825*l*(a) ("No proceeding to review any order of the Commission shall be brought by any person unless *such person* shall have made application to the Commission for a rehearing thereon.") (emphasis added). Even if Niagara Mohawk had challenged the retroactive fees, the City's failure to raise the same issue in a timely manner would preclude judicial review.[4]

Finally, we reject the City's contention that the issue of whether FERC has authority to impose retroactive fees is inextricably intertwined with the issue of whether it erred in denying the City a municipal exemption from payment of the fees. Although the two issues are related, in that they raise similar issues relating to FERC's treatment of passive landlords under the FPA and its regulations, they are nonetheless distinguishable. The court may assume, without deciding, that FERC acted within its authority in imposing the retroactive fees, and then determine whether it acted reasonably in denying the exemption based on the policies it has articulated. Because the City is barred from challenging the 1991 Licensing Order in the instant petition, we proceed in this manner.

### III.

The City contends that, even if FERC properly imposed the retroactive fees, the City was entitled to an exemption under § 10(e) of the FPA. Section 10(e) provides, in relevant part, that all licenses issued by FERC must include a condition that:

> the licensee shall pay to the United States reasonable annual charges ... for the costs of administration of [Part I of the FPA] ... *Provided further,* That licenses for the development, transmission, or distribution of power by States or municipalities shall be issued and enjoyed without charge to the extent such power is sold to the public without profit....

16 U.S.C. § 803(e). Similarly, the regulation implementing this provision states, in relevant part, that:

> A State or municipal licensee or exemptee may claim total or partial exemption from the payment of annual charges ... [t]o the extent that power generated, transmitted, or distributed by the project was sold di-

---

4. The city's contention that, under *COPCO,* it has a right to challenge an unlawful condition in a license at any time misreads that case. In *COPCO,* the petitioner sought judicial review of two orders of the FPC: one that asserted jurisdiction over an existing project, and one that granted the petitioner a license for a planned second project. The FPC did not impose any additional fees beyond those mandated by an existing agreement governing the first project, although the licensing order stated that additional charges might be imposed twenty years later. *Id.* at 431. The court concluded that the orders would not be reviewable until the FPC actually imposed additional charges. *Id.* at 434.

Nothing in *COPCO* suggests, however, that a party is entitled to judicial review of a final decision where it has not filed a timely request for rehearing. The language cited by the City, a quotation from *Peoples Bank v. Eccles,* 161 F.2d 636, 644 (D.C.Cir.1947), *rev'd on other grounds,* 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948), simply indicates that the passage of time would not bar the licensee from challenging the FPC's orders if the FPC were to decide to impose additional charges in the future.

rectly or indirectly to the public (ultimate consumer) without profit.

18 C.F.R. § 11.6 (1996). The City contends that it is entitled to the exemption because it simply collected rent from Niagara Mohawk, which generated and sold the power from the High Dam project to the public without profit.

FERC maintains that the City cannot qualify for the exemption unless it shows, first, that the City did not earn a profit on its lease of the High Dam project land and facilities to Niagara Mohawk, and second, that Niagara Mohawk did not earn a profit on the sale of power from the project. FERC denied the City's request for rehearing on the basis of the first prong, noting that the City received payments of $500,000 under the lease then in effect, and that it had failed to document any expenses to offset these receipts. 67 FERC at 61,433. FERC thus concluded that the rent payments were properly considered "profit" under § 10(e). *Id.; see also* 18 C.F.R. § 11.6(e) ("The matter of whether or not a profit was made is a question of fact to be established by the licensee.") The City contends that the amount it earned on its lease is irrelevant, and that the only appropriate factor for FERC to consider is whether Niagara Mohawk earned a profit on the sale of power to the public.

Because neither the FPA nor its legislative history defines the term "profit," we must defer to FERC's interpretation, so long as it is reasonable. *Alaska Energy Auth. v. FERC,* 928 F.2d 1181, 1183 (D.C.Cir.1991) (citing *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). FERC's regulations employ the term using a strict balance sheet definition. To qualify for the exemption, an entity must be able to show that its revenues from the sale of project power in any given year do not exceed its expenses, according to a prescribed accounting standard. 18 C.F.R. § 11.6(d). This court, and others, have upheld this interpretation as a reasonable exercise of FERC's authority. *See Alaska Energy Auth.,* 928 F.2d at 1183; *Power Authority v. FPC,* 339 F.2d 269, 274 (2d Cir.1964), *cert.*

*denied,* 381 U.S. 933, 85 S.Ct. 1766, 14 L.Ed.2d 699 (1965); *Central Nebraska Public Power & Irrigation Dist. v. FPC,* 160 F.2d 782, 786 (8th Cir.), *cert. denied,* 332 U.S. 765, 68 S.Ct. 72, 92 L.Ed. 351 (1947).

This definition needs further refinement, however, in situations in which more than one entity is involved in the distribution of the power generated by a project. For example, in *Alaska Energy Authority,* the licensee was a state-owned public corporation that sold power to several other entities, which in turn sold power to the public. Such resale relationships are governed by 18 C.F.R. § 11.6(e), which provides that a licensee is not exempt unless it can demonstrate that power is sold to the ultimate consumer without profit. Thus, the licensee must demonstrate that it earns no profit on the sale of power to the intermediary, and that the intermediary earns no profit on the sale of power to the public. *Alaska Energy Auth.,* 928 F.2d at 1182.

The instant case does not involve a resale situation. Rather, the City leased land and project facilities to Niagara Mohawk, which generated power and sold it to the public. Nonetheless, FERC treated this situation as analogous to the resale situation. 72 FERC at 62,208. We conclude that the agency's analysis is a reasonable interpretation of § 10(e) and its own regulations governing resale.

In denying reconsideration, FERC explained that its interpretation was reasonable because any resale relationship could be restructured as a lessor-lessee relationship. Instead of operating a project itself and selling power to an intermediary, a licensee could simply lease the project facilities to the intermediary, thereby replacing fee payments for the power with rent payments for the facilities. 72 FERC at 62,208. The logic of this position is not immediately apparent, because a lessor that does not construct, operate, or maintain a project does not need a license under § 23(b), and therefore does not have to pay any fee. In the instant case, however, the City derived a significant benefit from Niagara Mohawk's unauthorized operation of the High Dam project between 1949 and 1991, because it was receiving rent

payments on a lease that was renegotiated several times throughout that period.

Indeed, it is unlikely that the City and Niagara Mohawk would have structured their arrangement as a lessor-lessee relationship, in which the City did not construct, operate or maintain the High Dam project, if they had contemplated the payment of fees at the time the project was constructed. By structuring the transaction as a lease in that circumstance, Niagara Mohawk would have been responsible for the fee. Because Niagara Mohawk is not a municipality, it would not have been eligible for the exemption. Conversely, by structuring the arrangement as a resale of power from the City to Niagara Mohawk, the City would have been responsible for the fee. As a municipality, the City would have been eligible for the exemption if it could show that the power was ultimately sold to the public without profit. Significantly, once the Licensing Order was issued in 1991, the City and Niagara Mohawk did enter into a resale relationship. In essence, then, the relationship between the City and Niagara Mohawk between 1949 and 1991 was equivalent to a resale relationship. Consequently, FERC's decision to treat the lessor-lessee relationship in the same manner as a resale relationship was reasonable.

The question remains whether FERC properly determined that the City failed to make the necessary showing to qualify for the exemption. Although FERC expressed doubt as to whether the City had demonstrated that Niagara Mohawk sold the power to the public without profit, it declined to reach that issue. 57 FERC at 61,433, 73 FERC at 62,208 n. 14. Instead, it held that:

> Oswego has provided us with no information on the expenses it incurs in connection with leasing the project facilities to Niagara Mohawk.... In the absence of any data from Oswego, we would assume that the city's investment in the hydroelectric facilities and properties it leases to Niagara Mohawk have been fully or substantially depreciated, and that most of the $500,000 or more that Oswego earns per year from the lease of its hydroelectric facilities is profit. If that is the case, Oswego certainly would not qualify for an exemption from

the approximately $4,000 per year annual charges, even if Niagara Mohawk were losing money on its sale of power from the project.

57 FERC at 61,433. Given the length of time the project has been in operation and the absence of any contrary information, FERC could reasonably conclude that the bulk of the rent payments represented a profit to the City.

The City protests that FERC is restricting its ability to show that it did not earn a profit by requiring it to conform with the specific accounting standards mandated by 18 C.F.R. § 11.6(d). In fact, although FERC noted that its regulations do require a licensee seeking an exemption to prepare an income statement in accordance with its Uniform System of Accounts, 57 FERC at 61,432, the agency did not base its decision on the City's failure to comply with that rule. Rather, FERC noted that the City had not made *any* showing that it did not earn a profit on the lease. *Id.* at 61,433. The City has failed to identify any evidence in the record to the contrary. Instead, it simply insists that the issue of whether it earned a profit is irrelevant, and that FERC may only consider whether the operator of the High Dam project, Niagara Mohawk, earned a profit.

The City's remaining contentions focus on whether it adequately demonstrated that Niagara Mohawk earned no profit on its sale of power to the public. It relies on *Sabine River Authority*, 10 FERC ¶ 61,241 (1980), for the proposition that FERC should have fashioned "specific guidelines by which [the City] could demonstrate eligibility for a municipal exemption." In *Sabine River Authority*, FERC interpreted its regulation governing the application of the "without profit" exemption to resale relationships for the first time. *Id.* at 61,447. The licensees in that case were state power authorities that sold power to various utility companies. The companies, in turn, commingled that power with power from other sources, and sold it to a variety of consumers. *Id.* While it was undisputed that the authorities earned no profit on the sale of power to the companies, the issue was whether the authorities could show that the companies earned no profit on

the resale of power to the public. *Id.* at 61,449. Because of the administrative difficulty of determining revenues and expenses connected with one particular project when power from that source is commingled with power from other sources, FERC decided not to measure profit on the resale by its usual balance sheet method. Instead, it granted the exemption on the theory that state regulatory authorities would not permit the companies to earn any overall return on the sale of purchased power to their ratepayers. *Id.* at 61,451.

FERC has not applied the logic of *Sabine River Authority* in any other case. *See Alaska Energy Authority,* 928 F.2d at 1184–85. In any event, *Sabine River Authority* has no bearing on the first prong of FERC's test for the applicability of the "without profit" exemption: whether the initial seller's expenses exceeded its revenues in any given year. Because FERC based its holding on that prong in the instant case, its decision not to address *Sabine River Authority* was reasonable. 67 FERC at 61,433 n. 21. As FERC's order makes clear, the City provided no evidence of any expenses attributable to the High Dam project. Even now the City has not suggested what evidence it might offer. Thus, the City would not be entitled to the exemption even if it could show that, under the rule of *Sabine River Authority,* Niagara Mohawk earned no profit on its sale of power to the public.

## IV.

■ Finally, the City contends that FERC abused its discretion in failing to waive a penalty for late payment. The applicable regulations are 18 C.F.R. § 11.20, which provides that annual charges must be paid within 45 days after rendition of a bill, and 18 C.F.R. § 11.21, which provides upon failure to timely make timely payment, a penalty of 5% of the total bill will be imposed for the first month or part of a month in which payment is late, and an additional penalty of 3% will be imposed for each full month thereafter in which payment is late. Section 11.21 also gives the Commission discretion to waive any penalty "for good cause shown."

FERC's bill to the City was dated June 18, 1992. Payment was due 45 days later, on August 2, 1992. The City paid the bill on September 27, 1992. In filing its application with FERC for a municipal exemption and waiver of any late-payment penalty, the City advised that independent of its exemption request, the City was pursuing "the requisite authorization from its City Council to pay all or part of the assessed charges." The City further advised, however, that:

> Because of budget and financing limitations imposed upon the City, and due to the rehearing request [by Niagara Mohawk], the June assessment must be acted upon by the City Council during a public session of the council. Due to summer schedules, established before issuance of the assessment, the annual charge assessment could not be scheduled until the latter part of the month of August.

The City reiterated its argument concerning its scheduling difficulties in its petition for reconsideration, and presses the same contention here.

■ We afford substantial deference to FERC's interpretation of its own regulations, unless the agency's interpretation is " 'plainly erroneous or inconsistent with the regulation.' " *Bluestone Energy Design,* 74 F.3d at 1292 (quoting *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994)). Here, FERC's response to the City's request for a waiver was: "We do not see that the city government of Oswego faced any more difficulties in arranging its affairs to pay its annual charges obligations than other municipal licensees that paid their assessments on time." 67 FERC at 61,434. It is unclear whether FERC is stating that, as a matter of agency policy, scheduling obstacles beyond the licensee's control can never constitute good cause, or whether it is merely stating that the City failed to show that such obstacles were sufficiently severe to warrant application of the exception. In either event, FERC's statement is not responsive to the information supplied by the City. On the record before the court, the City would appear to be in a different position from municipalities that received their first annual pay-

ment bills in sufficient time to enable them to obtain necessary authorization from the appropriate government bodies to make timely payment, as well as from cities that were able to submit appropriations requests based on projections from past bills. Nothing contradicts the statement by the City's counsel that the City was moving promptly to obtain legislative authorization for payment of its first bill from FERC but that it confronted scheduling obstacles beyond its control such that its payment could not be timely. Because FERC's response reflects neither an appreciation of these apparent differences nor provides a basis for concluding that there was an alternative way for the City to make a timely payment by August 2, it was arbitrary.

Accordingly, we deny the petition except with regard to the late-payment penalty, which we remand to FERC for further consideration.