# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 17, 2018       Decided January 18, 2019

No. 17-1243

STATE OF NORTH CAROLINA,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CUBE YADKIN GENERATION, LLC,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*James W. Doggett*, Deputy Solicitor General, Office of the Attorney General for the State of North Carolina, argued the cause for petitioner. With him on the briefs were *Joshua H. Stein*, Attorney General, and *Matthew W. Sawchak*, Solicitor General.

*Robert M. Kennedy Jr.*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.

With him on the brief was *Robert H. Solomon*, Solicitor. *Holly E. Cafer*, Attorney, entered an appearance.

  *Michael F. McBride* argued the cause for intervenor. On the brief were *Julia S. Wood*, *Sharon L. White*, and *Eli W.L. Hopson*.

  Before: WILKINS and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

  Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

  SENTELLE, *Senior Circuit Judge*: North Carolina petitions for review of Federal Energy Regulatory Commission ("FERC") orders involving the relicensing of the Yadkin Hydroelectric Project No. 2197 ("Yadkin Project"). Petitioner alleges that the license applicant, Alcoa Power Generating, Inc. ("Alcoa"), misrepresented its plans to discontinue the use of project power for industrial production at Badin Works, a major source of employment in the state. North Carolina alleges that Alcoa gained an unearned advantage and chilled competition because no other applicant possessed Alcoa's ace in the hole: the ongoing industrial production at Badin Works and its impact on the public interest. North Carolina proposes that FERC reopen licensing proceedings, or, in the alternative, recommend federal recapture of the Yadkin Project for transfer to the state. We conclude that substantial evidence supports FERC's decision, and we deny North Carolina's petition for review.

I.     BACKGROUND

  In 1958, Alcoa was awarded a fifty-year license to operate the Yadkin Project, a series of hydroelectric dams on the

Yadkin River in North Carolina. The Yadkin Project powered industrial production at Badin Works, an aluminum smelting plant that provided approximately 1,000 jobs to citizens in the state. In 2002, Alcoa began the process of applying for a new license, immediately disclosing that aluminum production had been "temporarily curtailed," and that the Yadkin Project's excess energy was being "sold on the open market." Alcoa, again in 2004, informed FERC that the curtailment continued due to "adverse business conditions," and that "surplus electricity" was being sold "into the market." In its 2006 relicensing application, Alcoa explained that the Yadkin Project was only providing "3 to 5 megawatts (MW) of electricity" (or ~2% output) to Badin Works, so "the remaining power [was being] sold to help offset the cost of electricity purchases required for Alcoa's other domestic smelting operations." None of Alcoa's competitors filed timely applications.[1]

In 2009, North Carolina requested that FERC recommend federal recapture of the Yadkin Project for transfer to the state, with North Carolina funding Alcoa's "statutory net investment and severance damages." Months later, Alcoa formally announced that Badin Works would permanently close, and all aluminum smelting and manufacturing facilities would be dismantled. In July of 2016, Alcoa declared its intent to sell the Yadkin Project to Cube Yadkin Generation LLC ("Cube"), and it applied for a license transfer. On September 22, 2016, FERC issued Alcoa a new license and denied North Carolina's recapture proposal. *Alcoa Power Generating, Inc.*, 156 FERC ¶ 62,210 (2016). The state petitioned for rehearing of that

---

[1] In 2013—seven years after the deadline for applications—a competitor, New Energy Capital Partners LLC, moved to intervene and reopen licensing. FERC denied that request as untimely. *See New Energy Capital Partners, LLC v. FERC*, 671 F. App'x 802, 803 (D.C. Cir. 2016).

decision. In December of 2016, FERC approved the transfer of Alcoa's license to Cube, and the sale of the Yadkin Project was completed in 2017 for an after-tax value of approximately $243 million. Final resolution came on September 20, 2017, when FERC denied North Carolina's petition for rehearing. *Alcoa Power Generating Inc.*, 160 FERC ¶ 61,097 (2017).

On November 16, 2017, North Carolina petitioned this Court to review FERC's orders. The Court permitted Cube to intervene. The matter was fully briefed, and the Court heard oral argument on October 17, 2018.

II.     DISCUSSION

We review FERC orders under the Administrative Procedure Act ("APA"), which empowers the Court "to reverse any agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *See, e.g.*, *Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 742 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)). The Court owes deference to FERC's interpretation of the Federal Power Act ("FPA") since it is the agency charged with administering that statute. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *e.g.*, *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 358 (D.C. Cir. 2017). Unless "plainly erroneous," the Court also extends deference to FERC's interpretation of its own regulations. *See, e.g.*, *City of Oswego v. FERC*, 97 F.3d 1490, 1498 (D.C. Cir. 1996); *accord Auer v. Robbins*, 519 U.S. 452 (1997).

A.  Relicensing Proceedings

North Carolina avers foul play during the relicensing proceedings. Specifically, North Carolina believes that Alcoa engaged in a bait-and-switch by allegedly implying that the

Yadkin Project would resume supplying power to Badin Works, a major source of employment in the state. North Carolina argues that FERC should reopen licensing because Alcoa's alleged misrepresentations (1) served as patent deficiencies in its application and (2) gained Alcoa an unearned advantage by chilling competitors from applying.

Because Alcoa was the lone applicant, if its application truly was patently deficient, *see* 18 C.F.R. § 4.32(e), FERC should have reopened licensing and "solicit[ed] applications from potential applicants other than the existing licensee," *see* 18 C.F.R. § 16.25(a). *See also Oconto Falls v. FERC*, 41 F.3d 671, 672, 676–77 (D.C. Cir. 1994) (analogizing relicensing proceedings to those of an "orphaned project"—a project where "the licensee files a notice of intent to apply for a relicense but neither the licensee nor any other applicant files a timely [and valid] relicense application"). Indeed, it is uncontested that FERC generally has the authority to reopen licensing and fashion alternative remedies when equity or justice demands. *See* 16 U.S.C. § 825h. However, substantial evidence contradicts the existence of any deficiencies or deception in Alcoa's application.

Alcoa disclosed the curtailment of industrial production at Badin Works every step of the way, from its initial filing of intent to relicense, through its various correspondences with FERC, to the license application itself. Nothing in the record demonstrates any nefarious intent by Alcoa or Cube to deceive FERC or the public at large regarding the status of Badin Works. Although Alcoa initially characterized the curtailment as "temporary" in 2002, its subsequent missives reflected worsening circumstances, so much so, that it assigned the Yadkin Project's electricity purchase contract. The continued decline of Badin Works was publicly known, as were the adverse market conditions facing the domestic, aluminum-

smelting industry. Given that 98% of the power generated from the Yadkin Project was being sold as of 2006, the fate of Badin Works was apparent to any competitor wishing to pursue the license. Alcoa fully and accurately disclosed the circumstances surrounding Badin Works, both in its application and its correspondences more generally. Thus, no unearned advantage or chilling effect could result.

The loss of jobs from the closure of Badin Works is a dark and menacing cloud that hangs over the state of North Carolina. However, Alcoa did not conceal this impending squall, and thus, FERC did not err by denying North Carolina's request to reopen licensing.

## B. Federal Recapture

North Carolina also claims that FERC dismissed its federal recapture proposal without engaging in a reasoned analysis. The state's proposal—albeit creative—lacked any basis in the law.

FERC possesses the authority to "not issue a new license to the original licensee," and instead recommend that the federal government take over a hydropower project for "public purposes." 16 U.S.C. § 800(c). However, federal recapture is limited to projects that the government "take[s] over and thereafter . . . maintain[s] and operate[s]." *See* 16 U.S.C. § 807(a); *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 769 n.4 (1984). Under North Carolina's proposal, the federal government would not "maintain" or "operate" the Yadkin Project, but instead transfer it to the state. North Carolina does not and cannot identify a single case, statute, or regulation to provide authority for such a taking-and-transfer. As the plain language of the FPA establishes, Congress authorized federal recapture for *federal*

*use*, not subsequent transfer to state entities. Although FERC did not articulate this interpretation in its administrative orders, we may deny the petition for review on this ground because the statute is clear. *See, e.g.*, *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015).

In its decision, FERC correctly noted that North Carolina's proposal was pending for more than half a decade, ample time for the state to lobby or negotiate with federal agencies. During that time, however, no federal agency ever stepped forward to volunteer for this transfer. The absence of any agency volunteer evidences the fallaciousness of using the FPA's federal recapture for a state acquisition.

Indeed, the FPA provides a number of ways for a state to acquire a hydropower project, and North Carolina had and still has options for obtaining the Yadkin Project if it so desires. During the application period, North Carolina could have filed its own competing application. *See* 16 U.S.C. §§ 797(e), 808(a)(1). The state could potentially have initiated a condemnation proceeding of the Yadkin Project, acquiring title for "just compensation" to the licensee. *See* 16 U.S.C. § 807(a). And North Carolina could have negotiated a transfer from the licensee. *See* 16 U.S.C. § 801.

The elephant in the room, as with many things in life, is money. The cost of federal recapture equates to Alcoa's "net investment" plus severance damages. *See* 16 U.S.C. § 807(a); *Escondido*, 466 U.S. at 769 n.4. This amount may be less than "just compensation" or a negotiated transfer fee since the most recent sale of the Yadkin Project cost $243 million. *See id.*; 16 U.S.C. § 801. Coincidentally, the closure of Badin Works and the loss of jobs resulted in "a volcanic eruption . . . of anger" in North Carolina that "became a major political issue," with local politicians seeking to use monies from the Yadkin Project to

fund state initiatives, such as education. *See* Oral Argument at 10:00–10:43; 13:40–15:05; 16:00–16:40. However, thriftiness and political pressure do not create a legal basis for federal recapture when its sole purpose is transferring the hydropower project to a state. Indeed, none exists. Therefore, FERC did not err in denying North Carolina's federal recapture proposal.

## C. Public Interest

North Carolina also asserts that FERC erred in its licensing decision by failing to consider the adverse impact that permanent closure of Badin Works had on local employment and the public interest. However, the industrial need for power at the time of Alcoa's application was only 2% of the Yadkin Project's output, so FERC's analyses assumed that all project power would be sold into the open market. *See Final Environmental Impact Statement, Yadkin Hydroelectric Project – FERC Project No. 2197-073*, FERC, April 2008, at 239; *e.g.*, Oral Argument at 23:55–28:25. While the loss of jobs caused by the permanent closure of Badin Works did affect public interest, FERC had already accounted for its impact. *See id.* Thus, North Carolina's challenge to FERC's affirmative licensing decision is unavailing.

## III.    CONCLUSION

For the reasons set forth above, we deny North Carolina's petition for review.