# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 17-1251**

**September Term, 2020**

FILED ON: JULY 13, 2021

ENTERGY SERVICES, INC.,
> PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
> RESPONDENT

ARKANSAS PUBLIC SERVICE COMMISSION, ET AL.,
> INTERVENORS

---

Consolidated with 18-1009, 18-1010, 20-1023

---

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

---

Before: TATEL, WILKINS, and RAO, *Circuit Judges*.

## J U D G M E N T

This case was considered on the record from the Federal Energy Regulatory Commission, and on the briefs and oral arguments of the parties. It is

**ORDERED** and **ADJUDGED** that, in accordance with memorandum issued herein, the petitions for review are **DENIED**.

Pursuant to D.C. Circuit Rule 36, the memorandum will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41.

## Per Curiam

2

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/

Daniel J. Reidy
Deputy Clerk

# MEMORANDUM

The Federal Energy Regulatory Commission ("FERC") ordered Entergy Arkansas to pay damages for the misallocation of energy sales made under a now-defunct contract known as the Entergy System Agreement. In this consolidated case, Petitioners Entergy Services, Inc. ("Entergy"), the Louisiana Public Service Commission ("Louisiana"), and the Arkansas Public Service Commission ("Arkansas") seek review of the orders. Entergy argues that FERC erred by misinterpreting the contract and ordering damages. Louisiana and Arkansas argue that FERC's methods for calculating and allocating damages were arbitrary and capricious. For the reasons explained below, we deny the petitions.

## I

## A

Entergy Arkansas is an electric utility and a former member of the Entergy System, a cost-and capacity-sharing arrangement between power companies in Arkansas, Louisiana, Mississippi, and Texas. *See Council of New Orleans v. FERC*, 692 F.3d 172, 174 (D.C. Cir. 2012). From 1982 to 2016, the companies cooperated as one system under a rate plan approved by FERC. *See Ark. Pub. Serv. Comm'n v. FERC*, 891 F.3d 377, 379 (D.C. Cir. 2018); *see also Entergy Ark., Inc.*, 153 FERC ¶ 61,347 (2015). Within that system, the companies "share[d] the costs and benefits of power generation and transmission" under the terms of a contract known as the Entergy System Agreement ("System Agreement"), allowing them to equalize the costs and benefits of generating energy. *Ark. Pub. Serv. Comm'n*, 891 F.3d at 379.

The System Agreement contained several provisions distributing various costs and benefits between the companies. *See* J.A. 172–253. The allocation of energy costs under the System Agreement was principally governed by two provisions. First, section 30.03 provided that "energy from the lowest cost source available . . . shall be allocated . . . (a) first to the loads of the Company having such sources available . . . [and] (b) second to supply the requirements of the other Companies' Loads (Pool Energy)." J.A. 215–16. Second, section 30.04 stated that "Energy used to supply others will be provided in accordance with rate schedules on file with the Federal Energy Regulatory Commission" and that "[a] Company will be reimbursed for the current estimated cost of fuel used by the specific unit or units supplying the energy together with the adder determined in Section 30.08(f) on an hour by hour basis." J.A. 216. Under the protocol established by these provisions, the lowest-cost energy on the System was allocated to the "loads" of the Entergy System member which produced that energy. If that utility produced energy in excess of its "loads," then under section 30.03(b) it was deemed to have sent its excess energy to the pool, to be used by other System members to cover the "requirements" of their "loads." J.A. 215–16. After energy was allocated to fulfill each of the System member's loads, the remaining energy—the most expensive on the System—was deemed to have been used to fulfill "Sales to Others" under section 30.04.

The System Agreement also included a formula known as a "bandwidth remedy" to equalize the annual production costs of the companies. The bandwidth remedy prevented any individual company from having annual costs above or below the System average by more than

an 11-percent deviation. If a company's annual costs fell outside of these bounds, "payments [we]re made by the low cost Operating Companies to the high cost Operating Companies" to equalize the distribution of costs. *La. Pub. Serv. Comm'n v. FERC*, 771 F.3d 903, 906 (5th Cir. 2014) (alterations omitted) (internal quotation marks omitted).

In addition to the bandwidth remedy, each company carried a "Responsibility Ratio," an allocator variable representing the ratio between that company's "load responsibility" and the total System's load responsibility. J.A. 325. The responsibility ratio helped distribute the "costs, revenues, and reserves" among the companies equally. J.A. 1373 n.122. Several of the System Agreement's Service Schedules relied on the responsibility ratio as a measure for allocating costs. FERC Br. 15–16. The companies reported and reconciled the costs and revenues through a monthly invoice known as the Intra-System Bill.

## B

From 2000 to 2009, Entergy Arkansas sold energy on a short-term basis to off-system customers through a process known as "opportunity sales." J.A. 1349 n.5. Entergy contends that it had to make these opportunity sales because Louisiana delayed approval of another transaction that Entergy sought to make with Entergy Louisiana. In June 2009, Louisiana filed a FERC complaint against Entergy Arkansas under section 206 of the Federal Power Act, *see* 16 U.S.C. § 824*e*, alleging that Entergy Arkansas's off-system sales violated the terms of the System Agreement. FERC set Louisiana's complaint for investigation and hearing before an Administrative Law Judge ("ALJ"). Over the course of the next decade, the petitioners in this case—Entergy, Louisiana, and Arkansas—would litigate aspects of Entergy Arkansas's liability and damages across three stages of FERC proceedings.

In Phase I, the ALJ found that Entergy Arkansas violated the System Agreement by making opportunity sales, and the ALJ ordered Entergy Arkansas to make refunds to other System members. In June 2012, FERC affirmed in part and reversed in part. FERC held that Entergy Arkansas's opportunity sales were permitted under the terms of the System Agreement, but FERC determined that Entergy Arkansas had incorrectly allocated the cost of these sales under section 30.03 rather than section 30.04 of the System Agreement. J.A. 1401. FERC reasoned that section 4.05 of the System Agreement—a section referring to "[s]ales of capacity and energy to others for which any Company does not wish to assume sole responsibility"—allowed Entergy Arkansas to make opportunity sales, because the language of 4.05 meant that a company could make sales to "others" for which the company chooses to assume sole responsibility. J.A. 1392–93. However, FERC determined that Entergy Arkansas misallocated the opportunity sales by treating them as section 30.03 "loads" when they should have been treated as section 30.04 "sales to others." J.A. 1401. FERC remanded the case to the ALJ for a second round of proceedings to determine the amount of refunds owed by Entergy Arkansas.

In Phase II, the ALJ issued a decision determining the refunds owed by Entergy Arkansas. The ALJ adopted a method that involved re-running the Intra-System Bill for the era when

opportunity sales were made. FERC affirmed in part and reversed in part. This time, FERC held that the full Intra-System Bill should be re-calculated for the era during which opportunity sales were made, but certain adjustments to Entergy Arkansas's damages figure would be inherent in that re-calculation. In particular, FERC determined that when re-running the Intra-System Bill, the parties should remove the opportunity sales from the responsibility ratio (because the sales were no longer part of Entergy Arkansas's "load" responsibility), and the parties should adjust the final damages to remove excess bandwidth remedy payments made by Entergy Arkansas as a result of allocating opportunity sales a lower-than-required cost. Because the lower-cost allocation of opportunity sales artificially increased the bandwidth payments owed by Entergy Arkansas in years past, FERC determined that the rest of the System members would receive double damages unless those excess bandwidth payments were deducted from Entergy Arkansas's damages. FERC also held that Louisiana bore the burden of proof in the damages phase, contrary to what the ALJ had held below. *See* J.A. 1795–96.

In Phase III, FERC resolved additional disputes over the calculation of refunds by holding that there should be no limit on the amount of damages that could be offset by the bandwidth remedy, even if this meant imposing a loss on other members of the System Agreement. In other words: when the parties recalculated the costs of Entergy Arkansas's opportunity sales and allocated the opportunity sales to a higher cost under section 30.04, many of the opportunity sales became net losses, as the costs exceeded the revenue. By allowing Entergy Arkansas to deduct the bandwidth remedy from its overall damages, Entergy Arkansas might effectively impose these losses—*i.e.*, "negative margins"—onto other members of the System Agreement. J.A. 2177–78. FERC determined that this was a reasonable outcome because placing a limit on the bandwidth remedy reduction would give the other operating companies a "windfall" and essentially provide them "double damages" for Entergy Arkansas's earlier misallocations. *See* J.A. 2177.

At the close of Phase III, FERC ordered Entergy Arkansas to pay more than $135 million in damages to other members of the System—consisting of about $68 million in principal and $67 million in interest. J.A. 2276. Entergy now challenges the finding of liability and the refunds ordered, while Louisiana and Arkansas challenge the calculation and the distribution of refunds.

## II

Louisiana raises a threshold challenge to our jurisdiction over the petitions in Nos. 17-1251, 18-1009, and 18-1010, arguing that they were filed prematurely. A petition for review of a FERC order must be filed "within sixty days after the order of [FERC] upon the application for rehearing." 16 U.S.C. § 825*l*(b). At the same time, a party can only seek review under section 825*l* once FERC has issued a "final agency action"—any petition that comes before is "incurably premature." *Clifton Power Corp. v. FERC*, 294 F.3d 108, 111 (D.C. Cir. 2002). In this case, the petition in 17-1251 was filed sixty days after the denial of rehearing of Phase I and five days after the denial of rehearing of Phase II. The petitions in 18-1009 and 18-1010 were filed within sixty days of the denial of rehearing of Phase II. Louisiana argues that only FERC's order denying

rehearing of Phase III qualifies as final and that the orders concluding Phases I and II were merely interlocutory. We disagree.

An agency action is "final if it both (1) marks the consummation of the agency's decisionmaking process and (2) is one by which rights or obligations have been determined, or from which legal consequences will flow." *Smith v. Berryhill*, 139 S. Ct. 1765, 1775–76 (2019) (alteration adopted) (internal quotation marks omitted). In *Public Utilities Commission of California v. FERC*, we considered bifurcated FERC proceedings materially identical to those here. 894 F.2d 1372 (D.C. Cir. 1990). In that case, the petitioner sought review after the denial of rehearing of an order that made determinations as to liability and remedy methodology, but remanded to an ALJ to apply that methodology in the first instance. *Id.* at 1376. We held that the petition was not premature for two reasons. First, observing that the "finality inquiry" is "pragmatic," we noted that "FERC has already finally decided the substantive issue on appeal to us" and that "[t]here is no suggestion that immediate review would interfere with or frustrate the administrative process." *Id.* at 1377. Second, we took into consideration that "[t]here is no possibility that the remaining proceedings might moot the case by giving victory to the loser on other grounds." *Id.* Likewise, in *City of Oswego v. FERC*, we held that an order which adjudged liability but did not "specify the amount of the fee to be assessed or the procedure by which it was to be paid" was "final and therefore reviewable, because it imposed a definite obligation on the licensee to pay retroactive fees." 97 F.3d 1490, 1494 (D.C. Cir. 1996); *see also Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1171 (D.C. Cir. 2016) (observing that "courts may review an interlocutory order issued by FERC if it is definitive and imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process" (internal quotation marks omitted)).

Under *Public Utilities Commission* and *City of Oswego*, the orders denying rehearing of Phases I and II constitute final agency action. First, they "mark[ed] the consummation of the agency's decisionmaking process," *Smith*, 139 S. Ct. at 1775 (internal quotation marks omitted), because they "finally decided the substantive issue on appeal to us," *Pub. Utils. Comm'n*, 894 F.2d at 1377, ordering further proceedings only on the distinct and "limited issues" of remedy specified in its decision, J.A. 1818. Second, the conclusion of Phases I and II "imposed a definite obligation on" Entergy Arkansas to pay damages even if FERC's orders did not "specify the amount of the [refunds] to be assessed." *City of Oswego*, 97 F.3d at 1494. Although Phase III remained ongoing when the petitions were filed, there was "no possibility that the remaining proceedings might moot [this] case by giving victory to the loser on other grounds." *Pub. Utils. Comm'n*, 894 F.2d at 1377. Accordingly, we have jurisdiction over all of the petitions in this case.

### III

In No. 17-1251, Entergy challenges FERC's conclusion in Phase I that Entergy Arkansas had mischaracterized the opportunity sales as part of its load and therefore underpaid for energy. By treating the opportunity sales as part of its own load, Entergy Arkansas was able to allocate low-cost energy it produced to fulfill those sales, just as it would for its regular retail customers.

FERC, however, read the System Agreement differently. Although finding section 30.03 to be ambiguous, it determined that the opportunity sales were best understood as "Sales to Others" under section 30.04. J.A. 1400–02, 1831–33. This meant that the opportunity sales should have been deemed to have been fulfilled with the most expensive energy on the Entergy System and that more of the lower-cost energy produced by Entergy Arkansas should have been sent to cover the loads of other System members. As a result, FERC concluded that Entergy Arkansas had underpaid for energy while other System members had overpaid. Accordingly, it ordered Entergy Arkansas to pay refunds to the other System members. Entergy challenges FERC's interpretation of the System Agreement.

When "review[ing] claims that [FERC] acted arbitrarily and capriciously in interpreting contracts within its jurisdiction," we "employ[] the familiar principles of *Chevron*." *Entergy Servs., Inc. v. FERC*, 568 F.3d 978, 981 (D.C. Cir. 2009). "We evaluate de novo [FERC]'s determination that a contract is ambiguous, but we give *Chevron*-like deference to its reasonable interpretation of ambiguous contract language." *Id.* at 982. "Familiar contract interpretation principles apply" and "ambiguity arises" only "where an agreement is reasonably susceptible of different constructions or interpretations." *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 547 (D.C. Cir. 2010) (internal quotation marks omitted).

We agree with FERC that the term "loads" in section 30.03 is ambiguous—it does not clearly include or exclude opportunity sales. The System Agreement itself never defines "loads." And even the industry definitions cited by Entergy suggest that the term lacks a plain meaning in this context. One, from an industry group's glossary of common terms, primarily defines "load" as equivalent to "demand," which in turn is broadly defined as "[t]he rate at which electric energy is delivered to or by a system, part of a system, or a piece of equipment." J.A. 1341 (quoting Edison Elec. Inst., *Glossary of Elec. Util. Terms* (Dec. 1984)). *But see* Edison Elec. Inst., *Glossary of Elec. Indus. Terms* 38–39 (Apr. 2005) (noting that "'Load' may also be defined as an end-use energy-consuming piece of equipment or customer that receives power from the electric system"). This open-ended definition would seem to include opportunity sales. But the other glossary cited by Entergy, which comes from the U.S. Energy Information Administration, defines "load" as "[a]n end-use device or customer that receives power from the electric system." J.A. 813. Since Entergy Arkansas made the opportunity sales to intermediaries rather than directly to "end-use" customers, this definition would appear to exclude the opportunity sales from a utility's "loads." None of the other provisions of the System Agreement cited by Entergy clarify this ambiguity.

In the face of this uncertainty, FERC reasonably interpreted the System Agreement to classify opportunity sales as "Sales to Others" under section 30.04 instead of "loads" under section 30.03(a). As FERC observed, "Sales to Others" in section 30.04 is "more specific"—as off-system sales, the opportunity sales comfortably fit within the phrase's plain meaning. J.A. 1401. FERC's reading also accords with its interpretation of section 4.05, which addresses "[s]ales of capacity and energy to others for which any Company does not wish to assume sole responsibility." J.A. 189. These transactions, known as joint account sales, are off-system wholesale sales made on behalf of the entire Entergy System, in contrast to opportunity sales, which are off-system sales

from just one System member. Earlier in Phase I, FERC concluded that the clause "'for which any Company does not wish to assume sole responsibility' . . . implicitly means that an Operating Company may choose to assume sole responsibility for sales of capacity and energy to others, and that this means that the Opportunity Sales are allowed by the System Agreement." J.A. 1392. Having made the determination that "sales to others" includes opportunity sales for purposes of section 4.05, which no party challenges on appeal, FERC acted reasonably in concluding that the same phrase includes opportunity sales for purposes of section 30.04. J.A. 1401–02, 1832–33.

Entergy counters that section 30.04 applies only to joint account sales. It further observes that the practice in the Entergy System had been to treat off-system wholesale requirements sales made by an individual System member as part of that member's loads under section 30.03(a), even though those sales are also, in a literal sense, "to others." Entergy contends that opportunity sales should be treated like wholesale requirements sales since, in Entergy's view, the only material difference between them is that the former are made for discrete quantities of energy, while the latter obligate the utility to provide however much energy the customer requires. But setting aside the fact that FERC appears to have never endorsed Entergy's classification of wholesale requirement sales, this argument suffers from two defects. To begin with, "the prior practice of Entergy is only one piece of evidence when evaluating the terms of the System Agreement." J.A. 1833. Moreover, Entergy's reading of section 30.03(a) results in a narrow interpretation of section 30.04 that conflicts with that provision's text. As FERC explained, "section 30.04 makes no reference to the joint account, only to the sales being made to 'others.'" J.A. 1833. Given that section 30.04 itself makes no distinction between off-system sales made jointly and off-system sales made on an individual basis, FERC reasonably treated the joint account sales and opportunity sales alike. *See* J.A. 1833 ("If joint account sales are sales to others, by virtue of their being made off-system, it follows that similar off-system sales for which an Operating Company takes responsibility are also sales to others under the terms of the System Agreement.").

Finally, Entergy protests that if System members must pay for opportunity sales using the most expensive energy on the System, then opportunity sales would almost never be profitable. As all parties recognize, Entergy Arkansas would not have made virtually any of the opportunity sales in this case had it known in advance that they would be allocated under section 30.04. FERC's reading, however, ensures that opportunity sales never come at the expense of other System members or their captive customers. As FERC explained, "it is reasonable to read the System Agreement to give greater priority to on-system sales made to the native load customers who helped to pay for the generation, rather than to short-term off-system sales made to others." J.A. 1831.

FERC's interpretation of the System Agreement struck a reasonable "balance between the rights of individual Operating Companies to make opportunity sales for their own account and the rights of the system as a whole in the light of the System Agreement's language." J.A. 1835. We therefore reject Entergy's challenge to FERC's interpretation of the System Agreement.

**IV**

We next consider the refund ordered by FERC to remedy Entergy Arkansas's misallocation of the opportunity sales. In calculating a refund to the other operating companies, FERC sought to place the parties as close as possible to where they would have been had Entergy Arkansas correctly allocated the opportunity sales. To accomplish this, FERC ordered Entergy to re-run the Intra-System Bill, which is used for the System's accounting, under the assumption that the opportunity sales had been correctly allocated to the high-cost energy. FERC then adjusted that amount to reflect the effects the misallocation had on other provisions in the System Agreement, resulting in a total refund of $135,037,914.

We will not set aside FERC's remedial decisions unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). FERC's factual findings must be supported by substantial evidence. 16 U.S.C. § 825*l*(b). Because remedial decisions concern "the difficult problem of balancing competing equities and interests," our "scope of judicial review is particularly narrow" when we "review[] an administrative agency's choice of remedies to correct a violation of a law the agency is charged with enforcing." *La. Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1302 (D.C. Cir. 2014).

**A**

Entergy argues that no refund was warranted. We disagree. FERC rationally exercised its discretion to order a refund. This case is akin to one of overcollection, in which "a company over-collect[s] revenues to which it [is] not entitled." *See id.* at 1301. Upon a finding of overcollection, FERC ordinarily orders a refund to customers to remedy any excess payments. *Consol. Edison Co. of N.Y. v. FERC*, 347 F.3d 964, 972 (D.C. Cir. 2003) (explaining that FERC "has a general policy of granting full refunds for overcharges" (internal quotation marks omitted)). Similar to the overcollection of payments directly from customers, when Entergy Arkansas used its low-cost energy to service its opportunity sales, the other operating companies had to pay a higher rate for energy than they otherwise would have under the System Agreement, ultimately resulting in overcollection from those companies' customers.

FERC reasonably treated Entergy Arkansas's violation like an overcollection that warranted a refund under its general policy. First, Entergy Arkansas's violation harmed the other operating companies and their customers by causing them to overpay for energy. *See Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 818 (D.C. Cir. 1998) (considering whether a violation harmed others). By misallocating the opportunity sales to low-cost energy, Entergy Arkansas deprived the other operating companies from using that energy, driving up the costs for their customers. Second, Entergy Arkansas would have retained a windfall from its violation had no refund been ordered. *See id.* at 817–18 (considering whether a windfall would result); *Gulf Power Co. v. FERC*, 983 F.2d 1095, 1100 (D.C. Cir. 1993) (same). Entergy Arkansas made a substantial profit on the opportunity sales it misallocated, in part because it impermissibly used low-cost energy to fulfill the sales. Without a refund, Entergy Arkansas would keep this windfall despite its misallocation.

Pointing to FERC's case law, Entergy maintains that paying a refund in these circumstances was inequitable because FERC found Entergy Arkansas made the opportunity sales in good faith and violated only provisions of the System Agreement that FERC found to be ambiguous. But as FERC explained, even if Entergy Arkansas made the sales in good faith, that would not obviate the need for a refund to remedy the harm to the other companies and to prevent Entergy Arkansas from retaining a windfall. *See Gulf Power*, 983 F.2d at 1100 (finding no refund warranted when violation "produced savings for Gulf's customers rather than windfall profits for Gulf"); *accord Minn. Power & Light Co. v. FERC*, 852 F.2d 1070, 1073 (8th Cir. 1988). That Entergy Arkansas would retain a windfall also distinguishes Entergy Arkansas's violation from others in which ambiguity counseled against a refund. *See, e.g.*, *Koch*, 136 F.3d at 816–17 (finding FERC abused its discretion by ordering a refund for a violation of an ambiguous tariff provision that yielded no windfall to the violator). Entergy's arguments fail to undermine the reasonableness of FERC's determination that a refund was the appropriate remedy for Entergy Arkansas's violation of the System Agreement.

Nor was FERC's decision to order interest of about $67 million on the refund's principal amount of about $68 million arbitrary or capricious. This court has recognized that FERC's "general policy, in effect for many years, requires interest to be paid on various kinds of overcharges." *Anadarko Petroleum Corp. v. FERC*, 196 F.3d 1264, 1267 (D.C. Cir. 1999), *opinion vacated in part on reh'g on other grounds*, 200 F.3d 867 (D.C. Cir. 2000). "[I]nterest is simply a way of ensuring full compensation," *id.* at 1268, because "[c]ompensation deferred is compensation reduced by the time value of money," *id.* at 1267.

Entergy contends the amount of interest is "grossly excessive" because the interest almost equals the principal. Entergy Br. 39 (quoting *Gulf Power*, 983 F.2d at 1099). The large amount is due to the nearly two decades that have passed from when the opportunity sales began in 2000 and when the refund was ordered in 2019. A long delay between the injury and remedy "is a reason for awarding interest, not for denying it." *Anadarko*, 196 F.3d at 1268 (holding interest of about 160 percent of the principal due to a long delay was permissible).

Entergy also suggests that the delay, and therefore the accruing interest, was Louisiana's fault. To be sure, we have suggested that interest should be awarded "at least when the delay cannot be laid at the feet of the [complainant]." *Id.* But Louisiana filed this complaint only a few months after this court found the opportunity sales were outside the scope of a pending proceeding concerning FERC's approval of a new long-term allocation of the operating companies' capacities for power generation, which had been going on for many years. *See La. Pub. Serv. Comm'n v. FERC*, 551 F.3d 1042, 1046–47 (D.C. Cir. 2008); *see also Anadarko*, 196 F.3d at 1268 (explaining that "the snail-like pace of [] administrative proceedings are cause for complaint, but are not in themselves grounds for altering [a violator's] interest obligation"). Because Louisiana brought this complaint in a timely manner, FERC reasonably determined that Entergy Arkansas must pay the accrued interest.

**B**

FERC also rationally calculated the amount of the refund to account for the effects the misallocation had on other provisions in the System Agreement. To determine the appropriate refund owed to the other operating companies, FERC first had Entergy re-run the Intra-System Bill with the proper allocation of the opportunity sales. Because the misallocation affected other calculations under the System Agreement, FERC then made two adjustments: the bandwidth adjustment and the responsibility ratio adjustment, each of which Louisiana challenges here. Moreover, the correct allocation of energy costs after re-running the Intra-System Bill resulted in some opportunity sales having negative margins, meaning they resulted in losses to Entergy Arkansas. Entergy and Louisiana contest FERC's refusal to adjust the refund to account for the negative margins. We hold that FERC's calculation of the refund was reasonable and that its adjustments were not arbitrary and capricious.

**1**

We start with Louisiana's challenge to the bandwidth adjustment. Beginning in mid-2005, FERC equalized the production costs among the operating companies in the System through the "bandwidth remedy." *See La. Pub. Serv. Comm'n*, 111 FERC ¶ 61,311, 62,371 (2005), *review granted in part, cause remanded*, 522 F.3d 378 (D.C. Cir. 2008). Under the bandwidth remedy, a company with lower costs had to compensate other companies that had higher costs. When Entergy Arkansas made the opportunity sales, it had lower costs than the other companies, so it was required to make bandwidth payments to them.

Under the correct allocation of the opportunity sales, Entergy Arkansas would have had to use higher-cost energy to satisfy the sales, which would have raised costs for Entergy Arkansas and resulted in lower bandwidth payments to the other operating companies. In other words, the other operating companies received more in bandwidth payments than they would have under the correct allocation. Accordingly, FERC rationally decided to account for the excess bandwidth payments already received by the other companies by reducing the refund. *See Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C. Cir. 1984) (highlighting that we should not overturn "the Commission's [remedial] judgment . . . so long as the agency's determination has a rational basis").

Louisiana argues that FERC required the other companies to pay Entergy Arkansas for its violation, but the bandwidth adjustment required no payment from any operating company to Entergy Arkansas. Louisiana also contends that the bandwidth adjustment constitutes an impermissible out-of-period adjustment, which is prohibited because the bandwidth formula does not provide for any retroactive adjustments for changes to revenues and expenses outside the relevant period for a particular bandwidth payment. *See Entergy Servs.*, 139 FERC ¶ 61,105, 61,729 (2012), *on reh'g in part*, 145 FERC ¶ 61,047 (2013). Yet here there was no out-of-period adjustment to any bandwidth payment because the bandwidth adjustment merely reduced the damages owed by Entergy Arkansas, which ultimately paid about $135 million to the other companies.

Louisiana also contends that it is undisputed that the opportunity sales would have never been made had they been allocated correctly. This is beside the point. Entergy Arkansas in fact made the opportunity sales but with improper allocations. To remedy that violation, FERC was left to construct a hypothetical situation in which Entergy Arkansas made the sales but correctly allocated them, and the bandwidth adjustment was a commonsense measure to put the parties where they would have been in that situation.

**2**

Louisiana also challenges FERC's adjustment based on the responsibility ratio, which is used to allocate System costs among the operating companies in several Service Schedules. The ratio is based on each company's monthly load amount but excludes joint account sales and the "simultaneous hourly outputs to the systems of other interconnected utilities." *See* J.A. 181, 1796–97. A company with a higher responsibility ratio pays a larger share of System costs. Because Entergy Arkansas treated opportunity sales as part of its load for energy allocation, it also included opportunity sales in its monthly load amount for calculating its responsibility ratio. Yet FERC determined that Entergy Arkansas had misallocated the opportunity sales to its load, so Entergy Arkansas's responsibility ratio was higher than it would have been if it had excluded the opportunity sales from its monthly load, and thus Entergy Arkansas overpaid its share of System costs.

FERC rationally determined that the refund should be adjusted to reflect that Entergy Arkansas's responsibility ratio would have been lower under the correct allocation of the opportunity sales. As FERC explained, the responsibility ratio's exclusion of "outputs to the systems of other interconnected utilities" refers to off-system sales, and no one disputed that opportunity sales were off-system. J.A. 1797. Although Louisiana argues that Entergy Arkansas should have the "sole responsibility" for the costs of its opportunity sales, the responsibility ratio plainly relieves Entergy Arkansas of some costs by excluding the opportunity sales as off-system sales. FERC reasonably took the calculation of the responsibility ratio into account by reducing Entergy Arkansas's refund accordingly.

**3**

The final disputed adjustment concerns the negative margins. When the opportunity sales were reallocated to a lower energy priority, and therefore a higher price, some sales would have had negative margins. That is, some opportunity sales would have resulted in losses to Entergy Arkansas. FERC determined not to adjust the refund to remove these negative margins because Entergy Arkansas had the sole responsibility for the opportunity sales, regardless of whether they made a profit. Yet FERC also refused to insulate the other operating companies from all the effects of the negative margins by capping the bandwidth adjustment. Both Entergy and Louisiana challenge FERC's refusal to adjust for the negative margins.

Entergy argues that the negative margins should have been shared proportionally by the operating companies. FERC determined that the opportunity sales did not violate the System

Agreement because Entergy Arkansas assumed "sole responsibility" for them. As FERC reasonably found, that responsibility included any negative margins resulting from the sales. Entergy contends the negative margins should be shared by the operating companies as they would be for joint account sales. But FERC determined that joint account sales were only a "closer analogy" for opportunity sales—not that opportunity sales *were* joint account sales. Moreover, FERC's analogy concerned the allocation of energy, finding that opportunity sales should be treated as "sales to others," which also encompass joint account sales. J.A. 189 (capitalization altered). The allocation of margins is a different question. Entergy's reliance on a provision in the System Agreement specifically allocating the margins for "joint account sales" is therefore misplaced. *See* J.A. 242 (allocating margins for "sales to others for the joint account of all the companies" (capitalization altered)). No provision in the System Agreement spoke to the allocation of margins for opportunity sales, and FERC rationally decided that the margins belonged to the company that made the sales. Entergy Arkansas did not share the profits of the opportunity sales, so could not share its losses. Put another way, Entergy Arkansas "must take the bitter with the sweet." *S. Cal. Edison Co. v. FERC*, 805 F.2d 1068, 1072 (D.C. Cir. 1986).

Louisiana, for its part, argues that Entergy Arkansas in fact shared the negative margins with the other operating companies through the bandwidth adjustment, so FERC should have capped the adjustment to prevent the negative margins from affecting the other companies. True, the operating companies bore some costs from Entergy Arkansas's opportunity sales through the bandwidth adjustment. The System Agreement, however, permitted Entergy Arkansas to make the opportunity sales and to have the other operating companies share in the costs for them. As FERC explained, no provision in the System Agreement, including the bandwidth formula, provided for the exclusion of negative margins. Louisiana essentially seeks to place the parties where they would have been had the opportunity sales never been made. That approach does not comport with FERC's reasonable determination that the opportunity sales were permissible but misallocated.

Congress provided FERC with "a great deal of discretion" to remedy a violation of a filed tariff. *Columbia Gas*, 750 F.2d at 109. We hold that FERC did not abuse that discretion when it calculated the refund here.

## C

Louisiana also argues that FERC erred by holding that Louisiana—rather than Entergy—bore the burden of proving damages in Phase II of the proceedings. We disagree. First, Louisiana's argument seems to stem from a disagreement with FERC over the purpose of the Phase II proceedings, but FERC provided a reasoned explanation for structuring Phase II as it did. And second, Louisiana has not explained how it was prejudiced by FERC's assignment of the burden of proof. Thus, even though a "mid-course change in the assignment of the burden of proof . . . is hardly a preferred method of procedure," we find no error. *Air Canada v. Dep't of Transp.*, 148 F.3d 1142, 1156 (D.C. Cir. 1998).

During Phase II of the proceedings, the ALJ first held that Entergy bore the burden of

proving that when damages were calculated through a re-run of the Intra-System Bill, adjustments should be made to the damages via a recalculation of the responsibility ratio and the bandwidth remedy, after the re-pricing of the opportunity sales. FERC reversed that decision and held that Louisiana bore the burden of proof on not only liability in Phase I, but also damages in Phase II.

Louisiana argues that FERC's decision to saddle it with the burden of proof was arbitrary because Louisiana only assumed the burden of proof in Phase I to prove Entergy Arkansas's liability. As for Phase II, Louisiana argues, Entergy should have carried the burden of proof because Entergy was proposing an offset to the total damages it owed.

The first problem with Louisiana's argument is that it merely assumes Phase II involved an offset to damages or a change to Entergy Arkansas's rates. FERC reasonably rejected that assumption, explaining in its order that Phase II of the proceedings did not involve a request by Entergy to offset damages. *See* J.A. 1796 (noting that the recalculation of the responsibility ratio and bandwidth adjustment did not represent a "change" to a rate or an "affirmative defense" shifting the burden of proof to Entergy). Rather, the purpose of Phase II was to re-run the Intra-System Bill as if the opportunity sales had been priced under section 30.04 "sales to others." And the question of how to re-run the Intra-System Bill—accounting for the correct allocation of opportunity sales—was a question inherent in the "initial damage[s] calculation," not a secondary request to offset damages. *See* J.A. 1796. Louisiana thus bore the burden of proof as the complainant in these proceedings. *See* 5 U.S.C. § 556(d) (burden of proof lies with the "proponent of a rule or order"); J.A. 1795–96. As noted above, FERC has considerable discretion in structuring its proceedings, particularly when ordering damages. *Cf. Pub. Utils. Comm'n of Cal. v. FERC*, 143 F.3d 610, 617 (D.C. Cir. 1998). Here, FERC provided a reasonable explanation for why the burden of proof would remain with Louisiana in Phase II.

Louisiana also points to breach-of-contract cases where the burden of proof shifts to a defendant seeking to offset damages. *See* Louisiana Br. 27. But again, FERC ordered the Intra-System Bill to be re-run as an initial calculation of the total damages owed by Entergy Arkansas. The adjustment of the responsibility ratio and bandwidth remedy were integral to the proper calculation of those damages, not a second-step request for offsetting damages. In short, FERC reasonably concluded that the responsibility ratio and bandwidth adjustments were not separate inquiries requiring a shift in the burden of proof to the defendant. *See* J.A. 1796–97.

We note, however, that there "should be clarity at the outset of an administrative proceeding regarding where the burden of proof will lie, and some assurance that it will remain there while the matter is before the agency." *Air Canada*, 148 F.3d at 1157. Louisiana contends that clarity was lacking in these proceedings, because Entergy argued first and last before the ALJ in Phase II—a "procedural advantage[]" typically reserved for the party bearing the burden of proof. *See NorthWestern Corp.*, 140 FERC ¶ 63,023, 66,087–88 (2012); *see also NorthWestern Corp.*, 155 FERC ¶ 61,158, 62,133 (2016) (Order Denying Rehearing). Yet Louisiana never explains how, if at all, it was prejudiced by FERC's ultimate assignment of the burden of proof. Louisiana "point[s] to no evidence or arguments [it] would have made with [an] additional

submission and time." *See Air Canada*, 148 F.3d at 1157. The rule of prejudicial error applies here, and a party "asserting error [must] demonstrate prejudice from [that] error." *Id.* at 1156; *see also Consol. Gas Supply Corp. v. FERC*, 606 F.2d 323, 328–29 (D.C. Cir. 1979) ("The Administrative Procedure Act, however, provides that a reviewing court shall take due account of the rule of prejudicial error. We are to take note of this rule, and apply it, even if our review of the agency's action is expressly provided for by another enactment." (citation omitted)).

## V

Arkansas contends that FERC should have addressed below whether the bandwidth adjustment will be credited to Entergy Arkansas's ratepayers or to Entergy Arkansas's shareholders. In the proceedings below, FERC held that Entergy Arkansas's damages should be reduced due to years of overpayment on bandwidth remedies, but FERC declined to address how that reduction in damages would be distributed or credited between Entergy Arkansas's shareholders and ratepayers. Arkansas argues that because these bandwidth overpayments were paid by Entergy Arkansas's ratepayers during the years the opportunity sales were made, any credit for the bandwidth overpayments now belongs to ratepayers and not shareholders.

But FERC reasonably explained why this issue fell outside the scope of the proceedings below, and Arkansas fails to provide any reason to undermine FERC's discretion. We have held that FERC "is entitled to make reasonable decisions about when and in what type of proceeding it will deal with an actual problem." *Tenn. Gas Pipeline Co. v. FERC*, 972 F.2d 376, 381 (D.C. Cir. 1992) (citing *Mobil Oil Expl. v. United Distrib. Cos.*, 498 U.S. 211, 230–31 (1991)). "An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities." *Mobil Oil Expl.*, 498 U.S. at 230 (citing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978); *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)).

FERC excluded this ratepayer-shareholder distribution issue from the scope of the proceedings because the proceedings were limited to determining the refunds owed to other operating companies in the Entergy System. FERC never planned to address how costs would be distributed between ratepayers and shareholders. From its first order in Phase I, FERC explained that the scope of the proceeding would cover only "the allocation of costs among the Operating Companies under the System Agreement." J.A. 1404 n.251. FERC reiterated this instruction during Phase II, where it rejected Arkansas's request to "require" the bandwidth reduction be distributed to ratepayers. *See* J.A. 1815 n.293 ("[T]he scope of the proceeding [is] limited to allocation of costs among Operating Companies, not to allocations among classes of customers."). The only goal of the proceedings—as FERC frequently explained—was to "put all the Operating Companies in the same position they would have been in had Entergy correctly accounted for off-system sales made by Entergy Arkansas" from 2000 to 2009. J.A. 1982.

Our review here is deferential, and Arkansas fails to provide a reason that FERC was required to address this issue below. In fact, FERC's decision to exclude the issue is supported by the fact that state commissions, like Arkansas, are responsible for setting retail rates for the Entergy

System. As FERC explained in its order, FERC's ruling here does not prevent Arkansas from pressing the ratepayer distribution issue "in an appropriate forum." J.A. 1982–83; *see also Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 42 (2003) ("State regulators establish the rates each operating company may charge in its retail sales."); *La. Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 220 (D.C. Cir. 1999) ("[Entergy] subsidiaries' retail rates are set by state regulators based on principles of cost-of-service ratemaking."); *cf.* J.A. 2190 (responding to Louisiana's argument by noting that "[t]here is nothing unfair or unreasonable about limiting the scope in the damages calculation phase of a proceeding to the violation the Commission originally identified").

In both its order and at argument, FERC explained that, in its view, the decision to exclude the shareholder-ratepayer issue from the scope of the proceedings below would not preempt Arkansas from litigating the issue in another forum. *See* J.A. 1982 ("[T]he Commission has made no findings in this proceeding as to how the bandwidth adjustment to damages owed by an Operating Company should be treated for purposes of retail rates . . . and nothing in [Phase II] prevents the Arkansas Commission from pursuing this issue about the flow through of adjustments for bandwidth reductions in an appropriate forum."). At argument, counsel for FERC specifically stated that FERC "went out of its way not to say something that would be preemptive or preclude someone from making argument[s]" about that issue. Oral Arg. Tr. 59. Despite Arkansas's framing of this issue on appeal, FERC never decided that Entergy Arkansas's shareholders would receive the benefits of the damages offset while Entergy Arkansas's ratepayers would not. FERC merely declined to address how damages would be distributed between the two. *See* J.A. 1815.

Arkansas also argues that FERC's failure to address this ratepayer-shareholder distribution issue violated the cost-causation principle of agency ratemaking, which holds that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them." *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); *see also Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368–69 (D.C. Cir. 2004). But as Arkansas acknowledges in its opening brief, FERC was not setting rates in the proceedings below; FERC ordered damages to be paid by Entergy Arkansas to other operating companies. Arkansas Br. 24. Arkansas points to no case, and we have found none, requiring FERC to consider cost-causation principles when determining the damages owed on a tariff violation. Given FERC's considerable discretion over the structure of its own proceedings, it was reasonable for FERC to decline to address how the bandwidth-remedy reduction would be distributed between Entergy Arkansas's ratepayers and shareholders.

## VI

For the foregoing reasons, we deny the petitions.